## Case No. 14,842.

### UNITED STATES v. COMMANDANT OF FORT DELAWARE.

[1 Am. Law Rev. 576.]

District Court, D. Delaware. Nov. 17, 1866.

MARTIAL LAW—MILITARY COMMISSIONS—POWER TO TRY AND SENTENCE—HABEAS CORPUS.

Four men, three being citizens of South Carolina and one of Georgia, were tried by a military commission convened at Charleston, by orders from the headquarters of the department of South Carolina, dated Dec. 26, 1865, on charges and specifications alleging, in substance. that, being actuated by hostility to the United States, and with intent to oppose the military forces of the United States, on Oct. 8, 1865, at Brown's Ferry, S. C., whilst martial law was in force by authority of the president, did voluntarily associate with an armed band. and, acting therewith, with unlawful force, did attack and kill a military guard. The prisoners were found guilty. and sentenced to be hung; the president commuted the sentence. July 26, 1866, to imprisonment for life at the Dry Tortugas. whither they were sent; and they were removed thence, on the following 6th of August. to Fort Delaware, in Delaware. A writ of habeas corpus was issued for them, directed to the commandant of the fort, who brought them into court, and made return of the facts substantially as above.

HALL, District Judge. The competency of the military commission to arraign, try, and sentence the prisoners upon the charges and specifications against them, is the single point for consideration. If the commission had jurisdiction. the proceedings are conclusive; if it had not. they are void. To sustain the proceedings of the commission. the case of Rex v. Suddis. 1 East. 306. has been cited for the admission of Mr. Erskine. that, in the absence of all civil judicature. the military may try offenders. assuming that the condition of South Carolina afforded ground to presume the absence of all civil judicature to try offenders. But public documents of which the court must take notice

do not permit this presumption. The Rebellion had ceased, and the authority of the United States was acknowledged in that state; so that, the 30th June, 1865, the president issued his proclamation appointing a provisional governor, with authority to exercise all the powers to enable the loyal people of that state to restore it to its constitutional relation to the United States, directing that the district judge of the district in which South Carolina is included proceed to hold courts within said state, according to the provisions of the acts of congress, and that the attorney general instruct the proper officers to libel, and bring to judgment and sale, property subject to confiscation, and enforce the administration of justice, within the said state, in all matters within the cognizance and jurisdiction of the federal courts, &c. Under this provisional governor, the institutions of the state were in operation; the people of the state elected a governor, who entered upon his duties Nov. 29, 1865; and the provisional governor, having fulfilled his office, was relieved Dec. 22, 1865; so that, before the issuing of this commission, Dec. 26, 1865, the state was, in fact, in the exercise of its civil functions. Besides, if the commission had been issued because of the absence of civil judicature to take cognizance of the crimes, it would, indeed it must have been, so suggested in some part of the proceedings; there being no such suggestion evinces there was no such ground for this commission; nor would a temporary abeyance of civil judicature give jurisdiction to a military commission to try and sentence, however the military might be justified in arresting and detaining for the proper tribunal. The place to which Mr. Erskine's remark in 1 East. 306, applied was Gibraltar, a distant fortress, purely military; the subject, a soldier; the decision has no application. Transactions in our army in Mexico have been referred to. Mexico was a foreign country, conquered, its language and institutions unknown; South Carolina, a state of the Union rescued from rebellion, its laws and institutions restored. Acts Cong. 1863, c. 75, § 21 [12 Stat. 735], and 1864, Acts Cong. c. 215 [13 Stat. 356], have been relied upon for giving jurisdiction. The purpose of these acts is apparent on their face,—to enlarge the powers of the commanding general for executing, pardoning, or mitigating sentences of military commissions or courts martial, not to enlarge their jurisdiction. The commission derives no authority from these acts; congress intended no such thing. The ground on which this commission proceeded appears in the charges and specifications. It is, that the crimes were committed against a guard of the forces of the United States, composed of duly enlisted soldiers, on duty. The assumption is, that in cases of alleged offences by citizens against a guard of the army of the United States, detailed and on duty, and against enlisted soldiers on duty as such guard, it is competent to issue a military commission to arraign, try, and punish the offenders; the gist of the assumption being, that, of alleged offences by citizens against soldiers, soldiers should be the judges. Is this position in accordance with sound reason, or the fundamental principle of our laws? In so small a body, comparatively, as the army, so associated, with so much in common, so sensitive, there must be an esprit de corps that will not allow us to expect impartial justice from them in collision with citizens, while the broad ground of citizenship is not liable to this objection. This aspect of the case exhibits nothing favoring trial by military commission of alleged offences by citizens against soldiers; on the contrary, all sound principles are opposed to subjecting the accused to the disadvantages of such a trial.